## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, TERRENCE DUPONT, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I have been a Special Agent with the Federal Bureau of Investigation ("FBI") since April 2013.  I am currently assigned to the Economic Crimes squad with the Boston Division of the FBI.  Prior to this assignment, I spent two years on the Health Care Fraud squad and four and a half years on the Philadelphia Division's Public Corruption squad.  During my time in the FBI, I have participated in investigations relating to mail and wire fraud, money laundering, and aggravated identity theft.  I have also been the affiant on numerous complaint and search warrant applications.

2.      I am currently investigating CAIO FELIPE OLIVEIRA DOS SANTOS for various federal crimes, including mail fraud, wire fraud, and conspiracy to commit those crimes, in violation of Title 18, United States Code, Sections 1341, 1343 and 1349, respectively; aggravated identity theft, in violation of Title 18, United States Code, Section 1028A; and money laundering and conspiracy to commit money laundering, in violation of Title 18, United States Code, Sections 1956 and 1957 (collectively, the "TARGET OFFENSES").

3.      I make this affidavit in support of a criminal complaint charging DOS SANTOS with conspiracy to commit wire fraud, in violation of Title 18, United States Code, Section 1349. As set forth below, I have probable cause to believe that DOS SANTOS conspired with others known and unknown: (1) to open driver accounts with various rideshare and delivery service companies using stolen identities and/or falsified documents and (2) to make money by renting or selling those fraudulent accounts to individual drivers who might not otherwise qualify to drive for those services, and by exploiting referral bonus programs offered by the companies.

4.      The facts in this affidavit come from my personal observations, my training and experience, information obtained from other agents and witnesses, and my review of documents—including bank records, text messages and "chats" with the defendant and his co-conspirators, and other materials obtained through legal process and Court-authorized search warrants.   This affidavit is intended to show simply that there is sufficient probable cause for the requested complaint and does not set forth all of my knowledge about this matter.

## PROBABLE CAUSE TO BELIEVE THAT A FEDERAL CRIME WAS COMMITTED

### Overview of the Conspiracy

5.      Beginning by at least 2019 and continuing through at least April 2021, in the District of Massachusetts and elsewhere, DOS SANTOS conspired with others known and unknown to create fraudulent driver accounts with multiple rideshare and delivery companies (the "Rideshare/Delivery Companies"), and to rent or sell the accounts to individuals who might not otherwise qualify to drive for those services.   The evidence I have reviewed indicates that the scheme included the following:

a.      Obtaining images of victims' driver's licenses, or the information on victims' driver's licenses, and Social Security Numbers, from various sources including the DarkNet[1];

b.      Creating accounts to drive for the Rideshare/Delivery Companies using those stolen identifiers;

---

[1] The DarkNet is part of the Internet that is not indexed and consists of overlaying networks that use the public Internet but require unique software, configuration, or authorization to access, which is predominately designed to hide the identity of the user.  Payment for goods and services on the DarkNet is usually through virtual currency like Bitcoin, which is also designed to be anonymous.

c.      Renting or selling those accounts, including to people who might not otherwise qualify to drive for the Rideshare/Delivery Companies;

d.      Coordinating on prices charged to rent and sell accounts so as not to undercut each other's business;

e.      Sharing tips on how to circumvent the Rideshare/Delivery Companies' fraud detection systems;

f.      Causing the Rideshare/Delivery Companies to generate Internal Revenue Service Forms 1099 in the names of identity theft victims for income they never earned from the Rideshare/Delivery Companies, and attempting to divert those Forms 1099 from being sent to the victims;

g.      Using driver accounts for the purpose of referring other drivers to the Rideshare/Delivery Companies, and then collecting referral bonuses from the companies for additional fake accounts that the conspirators created;

h.      Utilizing global positioning system ("GPS") "spoofing" applications to "cut the line" for rides or deliveries, or to make it appear that trips were longer than they actually were, in order to obtain increased fares from the Rideshare/Delivery Companies, and selling this technology to clients.

6.      To date, investigators have identified more than 2,000 individuals whose identities were stolen and used as part of the scheme.

**Background on the Rideshare/Delivery Companies**

7.      Rideshare Company A is a ride-hailing company that connects drivers with riders via a mobile phone application ("app").  To become a driver for Rideshare Company A in Massachusetts, applicants must be at least 21 years old, have at least one year of driving history

3

(three years if under age 23), and pass a motor vehicle and criminal background check.  Drivers apply through Rideshare Company A's app or its website and provide, among other things, their name, date of birth, Social Security number, an image of their driver's license, automobile registration and insurance information, and a profile photo.  Drivers must also pass a separate background check run by the Massachusetts Department of Public Utilities ("DPU").  Rideshare Company A stores the information applicants enter on servers which are located outside the District of Massachusetts.

8.        Delivery Company B is an online food ordering and delivery service.  To become a driver for Delivery Company B in Massachusetts, drivers applying to deliver via automobile must be at least 18 years old, have at least one year of driving history, and pass a motor vehicle and criminal background check.[2]  Drivers apply through Delivery Company B's app or its website and provide, among other things, their name, date of birth, Social Security number, and profile photo.  Drivers applying to deliver via automobile must also provide an image of their driver's license.  Delivery Company B stores the information applicants enter on servers which are located outside the District of Massachusetts.

9.        Rideshare Company C is a ride-hailing company that connects drivers with riders via a mobile phone app.  To become a driver for Rideshare Company C in Massachusetts, applicants must be at least 25 years old, possess a valid driver's license, Social Security number, and vehicle insurance, have at least one year of driving history, and pass a motor vehicle and criminal background check.  Drivers apply through Rideshare Company C's app or its website and

---

[2] Some of the Delivery Companies allow drivers to deliver via bicycle or on foot in certain locations.

provide, among other things, their name, date of birth, Social Security number, an image of their driver's license, their automobile insurance information, and a photo of themselves ("selfie"). Drivers must also pass a separate background check run by the DPU.  Rideshare Company C stores the information applicants enter on servers located outside the District of Massachusetts and operated by Amazon Web Services.

10.     Delivery Company D is an online food ordering and delivery platform.  To become a driver for Delivery Company D in Massachusetts, drivers applying to deliver via automobile must be at least 18 years old, have a valid Social Security number, and pass a motor vehicle and criminal background check.  Drivers apply through Delivery Company D's website and provide, among other things, their name, date of birth, and Social Security number.  Drivers applying to deliver via automobile must also provide their driver's license number (but not an image of their license).  Delivery Company D stores the information applicants enter on servers located outside the District of Massachusetts and operated by Amazon Web Services.

11.     Delivery Company E is an online grocery delivery and pick-up service platform. To become a driver for Delivery Company E in Massachusetts, drivers must be at least 18 years old and pass a motor vehicle and criminal background check.  Drivers apply through Delivery Company E's website and provide, among other things, their name, date of birth, Social Security number, image of their driver's license, and a "selfie" photo.  Delivery Company E stores the information applicants enter on servers located outside the District of Massachusetts and operated by Amazon Web Services.

12.     When a driver account is opened, the Rideshare/Delivery Companies generally collect metadata concerning, among other things, the device used to open the account, its location,

the IP address used to submit the applicant's information, and whether the account was referred by another driver.

13.     Each of the Rideshare/Delivery Companies uses a third-party company to complete the motor vehicle and criminal background check on driver applicants.  This company runs the motor vehicle and criminal background check based on the name, date of birth, and Social Security number provided by the driver applicant.

14.     The DPU also completes a two-part background check for rideshare drivers in Massachusetts.  The DPU runs its background check based on the name, date of birth, driver's license number, and last six digits of the Social Security number provided to Rideshare Company A and Rideshare Company C by the driver applicant.  The DPU completes follow-up background checks on all Rideshare Company A and Rideshare Company C drivers in Massachusetts every six months based on this same information.

15.     None of the Rideshare/Delivery Companies requires that the vehicles used for rides or deliveries be registered to the driver.  It is not uncommon for drivers to use a vehicle registered to someone else.

16.     The Rideshare/Delivery Companies occasionally offer referral bonuses depending on market conditions.  To earn a referral bonus, existing drivers who are in good standing can refer another person to become a driver for the company.  Once the referred driver completes a set number of trips, which varies by company and market, the referring driver (and, at some companies, the referred driver) can earn a bonus.  The amount of the bonus depends on the company and the market and can be greater than $1,000.

17.     One way that the Rideshare/Delivery Companies pay their drivers is via direct deposit.[3]  Payments generally, but not always, appear on bank statements with the name of the driver who purportedly completed the trip or delivery.

18.     The Rideshare/Delivery Companies have various fraud detection systems in place. For example, Rideshare Company A periodically requires drivers to upload "selfie" photos to the app, which are compared to the driver's profile and license images.  Conspirators attempted to circumvent these fraud detection systems in multiple ways, including by (a) editing the images on victim's licenses to depict the subject driving under the fraudulent account, rather than the victim, (b) having subjects driving under the fraudulent accounts keep a printout of the victim's face with them to use when prompted for a "selfie," or (c) editing their own photo onto the victim's license and using GPS "spoofing" technology to make it appear the "selfie" they took matched the location of the subject driver when the subject was prompted to upload a "selfie."

## CAIO FELIPE OLIVEIRA DOS SANTOS

19.     The investigation has revealed that, as part of the scheme, DOS SANTOS (a) sold Social Security numbers to other co-conspirators, including WEMERSON DUTRA AGUIAR, who was previously indicted and has pleaded guilty to conspiracy to commit wire fraud and aggravated identity theft for his role in the scheme, *see United States v. Aguiar, et al.*, No. 21-cr-10158, Dkt. 291 (Rule 11 Hr'g) (Jan. 20, 2022); (b) rented and sold fraudulent driver accounts in victims' names; and (c) exchanged information with co-conspirators on how to circumvent the Rideshare/Delivery Companies' fraud detection systems.

---

[3] Some of the companies also offer a debit card option for payment.

20.     Pursuant to a Court-authorized search warrant, I obtained and reviewed co-conspirator AGUIAR's iCloud Account.  That account includes WhatsApp chats between AGUIAR and an individual I believe to be DOS SANTOS.[4]  This individual used the username "Caio Boston."  The telephone number associated with this account is registered to a Zelle account in DOS SANTOS's name.[5]  Additionally, in the chats, DOS SANTOS provided AGUIAR with his name, Caio Santos, and two of his email addresses, caiofee@hotmail.com and caiosantoszs123@gmail.com. DOS SANTOS also listed the caiosantoszs123@gmail.com email address on his U.S. visa application.  The WhatsApp chats are in Portuguese, and I have reviewed summary draft translations.

21.     The WhatsApp chats between DOS SANTOS and AGUIAR reflect that DOS SANTOS was selling victim Social Security numbers to AGUIAR.  For example, on or about October 15, 2019, AGUIAR sent DOS SANTOS an image of a victim's driver's license.  DOS SANTOS replied in a recorded message that he had found the victim's corresponding Social Security number and would sell it to AGUIAR for $120.[6]  On or about October 18, 2019, AGUIAR asked DOS SANTOS about the Social Security number associated with the driver's license

---

[4] WhatsApp is a text messaging application that provides users with end-to-end encryption, which means that a WhatsApp message is visible only to the sender and receiver of the message. WhatsApp also allows users to send and receive voice recordings.  WhatsApp users typically use their phone number as their WhatsApp account number to send and receive messages through the application.

[5] Zelle is a digital payment network owned by a group of banks, including Bank of America and Wells Fargo, among others.  Zelle allows users to send and receive money, typically over a mobile device, directly from their bank accounts at participating banks.

[6] In addition to text messages, WhatsApp allows users to record voice messages and send the recordings to other users.

AGUIAR had previously sent DOS SANTOS.  AGUIAR explained that his phone died, and he had lost all of his recorded messages.  In response, DOS SANTOS provided AGUIAR with four victim Social Security numbers in reference to several driver's licenses AGUIAR had previously sent him, including the Social Security number for "Victim JB."  Bank records reflect that AGUIAR sent DOS SANTOS $120 via Zelle payment on or about October 18, 2019.

22.     On or about the same day, DOS SANTOS sent AGUIAR a screenshot of his phone showing saved photos.  The driver's license images AGUIAR had sent him were in the screenshot (including an image of "Victim JB's" license), as well as additional victim driver's licenses, screenshots of payment confirmations, and a screenshot of a WhatsApp chat with images of additional driver's license images.

23.     On or about October 24, 2019, AGUIAR used the Social Security number for "Victim JB" that DOS SANTOS had provided him to open a driver account with Rideshare Company A in "Victim JB's" name.  Records from Rideshare Company A reflect that AGUIAR created the account near his apartment in Lynn, Massachusetts.

24.     On or about October 25, 2019, AGUIAR bargained with DOS SANTOS for a lower rate to obtain victim Social Security numbers after DOS SANTOS raised his rate to $150 per Social Security number.  DOS SANTOS told AGUIAR that he provided Social Security numbers to AGUIAR as well as another individual.  Bank records confirm that AGUIAR sent DOS SANTOS $150 on or about October 28, 2019.

25.     On or about October 27, 2019, DOS SANTOS asked AGUIAR if he had more driver's licenses (for which AGUIAR would need corresponding Social Security numbers).  AGUIAR responded that he did have more and agreed to send DOS SANTOS $200 in exchange for two Social Security numbers.  AGUIAR later sent a screenshot to DOS SANTOS of a $200

Zelle payment confirmation.  Bank records confirm that AGUIAR sent DOS SANTOS $200 on or about October 29, 2019.  On or about October 29, 2019, AGUIAR told DOS SANTOS that he needed to confirm with his partner if they had more driver's licenses to send DOS SANTOS.

26.     On or about November 7, 2019, DOS SANTOS notified AGUIAR that he had acquired a new system able to perform deeper searches for Social Security numbers.

27.     DOS SANTOS and AGUIAR also discussed the creation and sale of fraudulent driver accounts.  For example, on or about November 5, 2019, DOS SANTOS notified AGUIAR that he had three delivery driver accounts, two with Delivery Company D and one with another delivery company, and asked AGUIAR if he could help DOS SANTOS sell the accounts. AGUIAR asked DOS SANTOS the price for the accounts, to which DOS SANTOS replied that he wanted $250 for each of the driver accounts with Delivery Company D and $350 for the other delivery driver account.

28.     DOS SANTOS and AGUIAR also discussed how to get past the various background checks and fraud detection systems of the Rideshare/Delivery Companies.  For example, on or about October 18, 2019, AGUIAR and DOS SANTOS discussed how long it was taking for the Rideshare Companies to approve new accounts.  DOS SANTOS suggested that AGUIAR contact the DPU directly to speed up the background check process and issue the code that was needed for the Rideshare Companies to approve new driver accounts.  DOS SANTOS then provided AGUIAR with an email address for DPU.  When AGUIAR asked, DOS SANTOS told AGUIAR that AGUIAR should contact DPU from each email he had used to open a fraudulent account and instructed AGUIAR on what to say in the emails to DPU.

29.     On or about October 28, 2019, DOS SANTOS asked AGUIAR about how to provide the Rideshare/Delivery Companies with images of the backs of driver's licenses.

10

AGUIAR told DOS SANTOS that he was aware that others had taken a picture of the back of a driver's license on a white paper, which seemed not to raise any flags during the fraudulent driver account application process.

30.     DOS SANTOS and AGUIAR also discussed editing driver's license images such that the images on victim's licenses depicted the subject driving under the fraudulent account, rather than the victim.  On or about October 15, 2019, AGUIAR complained to DOS SANTOS that the individual who edited driver's license images for AGUIAR was taking too long because he was working with someone else in Boston.  AGUIAR said he believed that he and DOS SANTOS used the same person in Brazil to edit driver's license images.  On or about October 17, 2019, AGUIAR notified DOS SANTOS that he had found someone else to edit driver's license images who charged $50 per license.

31.     On or about October 26, 2019, AGUIAR told DOS SANTOS that he suspected the person editing driver's license images for him was selling AGUIAR's driver's license images to others, resulting in the fraudulent accounts AGUIAR attempted to open being denied by the Rideshare/Delivery Companies because an account already existed.  AGUIAR sent DOS SANTOS a screenshot of a WhatsApp chat between AGUIAR and another co-conspirator, "Marcos," in which Marcos had sent AGUIAR a screenshot he had with another co-conspirator, "Luana," discussing the quality of the work the individual editing the license images delivered, but that the cost ($100 per license) was too expensive.

32.     On or about November 7, 2019, DOS SANTOS asked AGUIAR if he could refer someone who could edit driver's license images for DOS SANTOS.  AGUIAR said he used a person who edited license images for $50 per license and turned the edited images around in about two days.

33.     On or about November 7, 2019, co-conspirator PHILIPE DO AMARAL PEREIRA, who was previously indicted and has indicated his intent to plead guilty to conspiracy to commit wire fraud and aggravated identity theft for his role in the scheme, *see United States v. Aguiar, et al.*, No. 21-cr-10158, Dkt. 478 (Status Report) (July 22, 2022), asked AGUIAR via WhatsApp if his partner in the scheme was an individual named "Caio."  On or about November 24, 2019, co-conspirator ITALLO FELIPE PEREIRA DE SOUSA CORREA, who was previously indicted and has pleaded guilty to conspiracy to commit wire fraud and aggravated identity theft for his role in the scheme, *see United States v. Aguiar, et al.*, No. 21-cr-10158, Dkt. 526 (Rule 11 Hr'g) (Aug. 23, 2022), asked AGUIAR via WhatsApp if his contact for procuring Social Security numbers was an individual named "Caio."

34.     A cooperating witness who is known to me but whose cooperation in this matter has not yet been disclosed[7] provided information that another co-conspirator told him that "Caio" received more than $50,000 in referral bonuses from Rideshare Company A before returning to Brazil.  DOS SANTOS returned to Brazil in or about August 2020.  According to this same cooperating witness, "Caio" was good with computers and, with other co-conspirators, created a "bot" that enabled users to "cut the line" to grab batches of deliveries on Delivery Company E's app.[8]

35.     I have reviewed a bank account in DOS SANTOS's name at Bank of America.  The addresses associated with the account were in Chelsea and Fall River, Massachusetts.  Between in

---

[7] I understand that this cooperating witness, who had no criminal history prior to their arrest in connection with this conspiracy, provided this information in the hope of obtaining a reduced sentence.

[8] A "bot" is a software application that runs automated tasks over the Internet.

or about January 2019 and in or about November 2021, DOS SANTOS received approximately $244,000 in total inflows. This amount includes approximately $75,000 in payments from the Rideshare/Delivery Companies, including more than $19,000 in the names of at least 29 other individuals.[9] Two of these names were also used by other co-conspirators to create fraudulent accounts. The approximately $244,000 in inflows DOS SANTOS received also includes approximately $100,000 in Zelle transfers, including payments from co-conspirators AGUIAR, PRISCILA BARBOSA, THIAGO DE SOUZA PRADO, LUIZ NARCISO ALVES NETO, FLAVIO CANDIDO DA SILVA, and ALTACYR DIAS GUIMARAES NETO, who were all indicted for their respective roles in the conspiracy, *see United States v. Aguiar, et al.*, No. 21-cr-10158, Dkt. 189 (Second Superseding Indictment), as well as other uncharged co-conspirators. Many of the Zelle transfers were recurring transfers from the same individuals, typically in amounts between $100 to $350. Based on my knowledge of this investigation, I believe that many of these transfers were from individuals renting or buying fraudulent driver accounts or co-conspirators buying Social Security numbers.

---

[9] As explained above, direct deposit payments from the Rideshare/Delivery Companies generally, but not always, appear on bank statements with the name of the driver who purportedly completed the trip or delivery. A number of the payments that DOS SANTOS received from the Rideshare/Delivery Companies did not include the name of the driver, however. Additionally, when the Rideshare/Delivery Companies pay out referral bonuses, these payments do not always indicate which driver the bonus is associated with.

**CONCLUSION**

36.     Based on my knowledge, training, and experience, and the facts set forth in this affidavit, I respectfully submit that there is probable cause to believe that DOS SANTOS conspired to commit wire fraud, in violation of 18 U.S.C. § 1349.

Sworn to under the pains and penalties of perjury,

*Terrence Dupont*
Terrence Dupont
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me on September ____, 2022 by telephone

**Sep 30, 2022**

*Judith Gail Dein*
Hon. Judith G. Dein
United States Magistrate Judge